UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDDIE WINTERS, Plaintiff, v. CITY OF HARVEY, a Municipal Corporation; Mayor CHRISTOPHER J. CLARK, and City Administrator TIMOTHY WILLIAMS Defendants. | Case No. 20-cv-02248 Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eddie Winters ("Winters") sues his former employer, the City of Harvey ("the City"), the City Mayor Christopher J. Clark ("Clark"), and the City Administrator Timothy Williams, ("Williams") alleging that Defendants retaliated against him in violation of the First Amendment and in violation of various state laws [18]. Defendants move for summary judgment. [79]. For the reasons explained below, this Court grants Defendants' motion for summary judgment on the federal claims, Counts I and II and declines to exercise jurisdiction on the state law claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

The Court takes the following background facts from Defendants' statement of facts [80]; Winters' response to Defendants' statement of facts [87], Winters' statement of additional facts [88], and Defendants' response to Winters' statement of additional facts [97]. The Court notes where material facts are disputed.

***Winters is appointed Police Chief.***

2

Plaintiff Eddie Winters is the former Police Chief of Harvey, Illinois [80] ¶ 4. Mayor Christopher Clark is the current Mayor of Harvey and was the Mayor of Harvey when Winters was employed as the City's Chief of Police. *Id*. ¶ 6. Prior to being elected Mayor, Clark served as an alderman. *Id*. ¶ 12. Timothy Williams is the former City Administrator of Harvey. *Id*. ¶ 7.

Clark ran for Mayor of Harvey on a platform of aggressive reform, including ridding Harvey of corruption and restructuring the Harvey Police Department ("HPD"), instituting more accountability for the HPD, and giving the citizens of Harvey a better quality of life. *Id*. ¶ 13. Winters disputes that these were Clark's true intentions, although he concedes that this was Clark's campaign platform. [87] ¶ 13. In April 2019, Clark was elected Mayor of Harvey; he continues to serve as the Mayor. [80] ¶ 14.

Once elected, Clark wanted to hire a Police Chief who could help him implement the changes to the HPD that he promised to voters. *Id*. ¶ 15. Shortly after his victory, Clark appointed Williams to the position of City Administrator. *Id*. ¶ 16. Williams then referred Winters to Clark for the Police Chief position. *Id*. ¶ 17. Winters submitted his resume and was interviewed by Clark and Clark's chief of staff, Corean Davis. *Id*. ¶ 18. At the time Winters was hired, he had worked for the City of Chicago Police Department ("CPD") for 25 years, achieving a rank of lieutenant. [80] ¶ 19. Winters had not worked for any other law enforcement agency. *Id*.

During Winters' interview, Clark told Winters his plans for reforming Harvey, including reforming and restructuring HPD, ridding the department of corruption, and bringing more accountability to HPD. *Id.* ¶ 20. Winters was "on board" and interested in helping Clark reform the department based on Clark's vision and campaign platform. *Id.* ¶ 21. Winters retired from CPD and accepted a position as the Harvey Chief of Police on May 14, 2019. [87] ¶ 1; [80] ¶ 24.

The duties and responsibilities of the Chief of Police are provided in the Harvey Municipal Code. [80] ¶ 26. The Code delineates the responsibilities and authority of the Chief, in part, as follows:

> Subject to the … direction of the mayor, the chief of police shall have the power and duty: A. To administer the affairs of the department as its chief administrative officer; B. To organize the department with the approval of the mayor; C. To make appointments, promotions, transfers of and to take disciplinary action against employees of the department …;

*Id.*

### *Winters' communications with the FBI.*

Shortly after becoming Chief, Winters requested an in-person meeting with the FBI. [88] ¶ 2. On May 30, 2019, Winters went to the FBI office in Orland Park and met with Agents Nijika Rustagi and Michael Gorman. *Id.* ¶ 3. During the meeting, Winters told the agents that he was trying to implement new policies at the HPD regarding evidence that had been seized, and that he had discovered a room that appeared to have been used as a personal garage ("the garage") by former Harvey Police Officer Derrick Muhammad (who was arrested by the FBI in March 2019). *Id.*

¶ 4. Winters was concerned about the garage's contents because he believed that it contained evidence that had not been lawfully inventoried or maintained. *Id*. ¶ 5.

Agents Rustagi and Gorman visited the garage on May 30, 2019, but did not find anything of interest. [80] ¶ 40. None of the objects in the garage constituted evidence of crimes that had not been properly inventoried, and all the things in the room were organized and disposed of internally by HPD. *Id*. ¶ 48. It is undisputed that it was Winters' idea for the FBI to look at the garage and that the FBI was not investigating it prior to Winters' disclosure. [88] ¶ 6. The parties dispute whether Winters' job duties include "liaising" with outside law enforcement agencies, including the FBI. [97] ¶ 9.

Winters testified he told Clark that he had reported the garage to the FBI and that he had asked the agents to come view the garage. [88] ¶¶ 10, 11. Clark disputes this and testified in his deposition that he had no knowledge of any conversations Winters had with the FBI. [97] ¶ 10.[1] Williams admitted that he knew Winters had meetings with various law enforcement agencies, including the FBI. [97] ¶ 11. Williams also admitted that he was "acutely aware" that the FBI was still involved in an investigation into Harvey. *Id*. ¶ 12. Although Clark denied that Winters told him about his conversations with the FBI, it is undisputed that Williams and Clark spoke regularly and were in almost constant contact. [88] ¶ 13. And Winters testified

---

[1] The record contains an undisputed email where Winters reports to Clark that he met with the FBI on October 3, 2019, to discuss intelligence regarding Harvey and "the liquor license". [94-6] at 2. Further, Willie Giddens, a Harvey Police Officer, testified that he had heard of other members of the department being interviewed by the FBI. *Id*. ¶ 15.

he kept *both* Clark and Williams apprised of his communications with the FBI. *Id.* 14.

On January 27, 2020, Winters met with Agent Rustagi and told her that he was being pressured to promote certain officers. [80] ¶ 42. However, it is undisputed that Winters did not tell Agent Rustagi that there were any "issues or problems with the City" because he had been speaking with the FBI. *Id.* ¶ 43.

### *Dispute over the appointment and promotion of Giddens, Winston and Biddings.*

The parties dispute the promotions of Willie Giddens ("Giddens"), Justin Winston ("Winston") and Cameron Biddings ("Biddings") to the position of commander. Clark asserts he wanted Giddens, Winston, and Biddings promoted to the rank of Commander because they served on his *security detail,* driving him to and from work and to events and providing him with physical security. [80] ¶ 50. He wanted the three at the rank of commander so that if they gave an order regarding his security, all lower-ranking officers would be required to follow that order. [80] ¶ 51. Clark also testified that he supported them for the position of commander because they supported his vision for reform, and he believed they could help implement his agenda. *Id.* ¶ 52.

Winters describes Clark as pressuring and ordering him, over his protests, to promote Giddens and Winston, who had openly supported Clark's mayoral campaign, despite their histories of misconduct and lack of qualifications. [87] ¶ 49.[2] Winters

---

[2] Winters also disputes that Clark believed Giddens, Winston and Biddings would help implement a reform agenda, and contests Clark ever sought to implement a reform agenda. [87] ¶ 52.

6

also asserts Clark wanted them to be Commanders, not Commanders on *security detail*. [87] ¶ 50. It is undisputed Winston was promoted to Commander of Clark's security detail, while Giddens was promoted to Commander of patrol, and Biddings to Commander of operations. *Id.*

Winters initially issued an order placing Giddens, Winston and Biddings at the rank of Commander on January 19, 2020. *Id.* ¶ 54. Winters admits he initially issued an order promoting them to Commander but testified that he thought it was illegal to hire Giddens and Winston *just because* of their political support for Clark. [87] ¶ 54. He testified that he thought promoting Giddens, Winston and Biddings would communicate a message to the public that there was still corruption in Harvey. *Id.* He also advised Clark that Giddens would cause liability for the department. *Id.*

On January 22, 2020, three days later, Winters rescinded the order and returned Giddens and Winston to patrol. [80] ¶ 55. He emailed Clark advising him that he would not be promoting Winston, Giddens or Biddings. [88] ¶ 30. The next day, Clark responded that he was "sorry to hear this" and would "accept [Winters'] resignation effective immediately." *Id.* ¶ 31. Clark testified that Winters' refusal to promote Winston, Giddens and Biddings to Commander was the "straw that broke the camel's back" regarding his decision to terminate Winters. *Id.* ¶ 32.

### *Dispute over Eric Armstrong's assignment.*

FBI Agent Rustagi told Winters that Sargeant Eric Armstrong was helpful in the FBI's prior investigation of the City of Harvey. [80] ¶ 37. But the parties dispute whether Clark knew of Armstrong's involvement in the FBI's effort to uncover

7

corruption within the HPD. Clark says he never knew that, and Winters never told him so. [80] ¶ 56. Winters testified he told Clark that Armstrong was *instrumental* in working with the FBI to investigate corruption, and he did so after Clark repeatedly told Winters to either terminate or transfer Armstrong without cause. [87] ¶ 56. Clark also insists that he never asked Winters to fire Armstrong. [80] ¶ 57. Winters denies this, and insists Clark ordered him to terminate Armstrong or transfer him out of Internal Affairs and back to patrol multiple times. [87] ¶ 57. Winters testified he told Clark that he could not fire Armstrong without a reason and reminded Clark and Williams that Armstrong had supported Clark's political rival during the 2019 mayoral election. *Id*. Clark admitted at his deposition that Winters reported feeling pressured to do something unethical and illegal. *Id*.

Despite Winters' requests, he testified that neither Clark nor Williams provided him with a reason to terminate Armstrong. *Id*. Winters refused to put Armstrong back on patrol because Armstrong worked in Internal Affairs where he was tasked with investigating corrupt officers, and Winters feared other officers would not support him in high-risk situations or attack him because of his knowledge. [88] ¶ 36.

During this dispute about Armstrong's assignment, Clark texted Winters and ordered him to "[p]ut Armstrong… where I told you." [87] ¶ 59. He texted further "[a]nd if this is not gotten under control, I will micromanage more." *Id*. Clark admits sending the text message, but testified he did so because social media posts were made that the HPD had no one at the front desk, and Winters recommended putting

8

sergeants at the front desk. [80] ¶ 60. Winters disputes he ever recommended putting sergeants at the front desk, and disputes further that there were any personnel issues at the front desk. [87] ¶ 60. Clark testified that he sent that text because Winters had still not moved Armstrong to the front desk. [80] ¶ 61. Winters testified that the text was an order to place Armstrong on the "shittiest" assignment Winters could find. [87] ¶ 61.

### *Winters is terminated.*

The Mayor has the power to appoint and terminate the Chief of Police "with the advice and consent of the City Council". [80] ¶ 22. Winters' appointment was approved by City Council. *Id.* ¶ 24. However, according to Winters, he was terminated without the consent of City Council. [87] ¶ 22.

On January 15, 2020, Winters testified he had a phone call with Williams where he complained about Williams' and Clark's micromanagement and unrealistic expectations. [87] ¶¶ 37-38. Winters testified that Williams told him "fuck you in a handbasket!" and "we can meet anywhere and anytime to handle this!". *Id.* ¶ 38. Winters further testified he asked Williams whether Williams was threatening him, and Williams responded, "take it like you wanna!". *Id.* ¶ 39. Williams denies this conversation ever occurred. [97] ¶¶ 38-39.

On January 17, 2020, Winters sent a formal complaint to the Human Resources Director, Erica Kimble, complaining about treatment by Williams. [80] ¶ 28. Winters reported that Williams assaulted him, and described Williams' demands for Winters to make personnel decisions he found inappropriate. [87] ¶ 28. Winters

also reported the incident to Clark. [88] ¶ 40. To address Winters' complaint, Clark requested Winters attend a meeting with him at City Hall. [80] ¶ 29. The meeting occurred on Sunday, January 19, 2020. *Id*. Winters, Clark, Inez Riley and Corean Davis (Clark's chief of staff) were in attendance. *Id*.

On January 23, 2020, four days later, Clark placed Winters on administrative leave, and shortly after decided to terminate him. *Id*. ¶¶ 30-31. On January 27, 2020, Clark sent Winters a letter terminating him effective immediately. *Id*. ¶ 33. The letter indicated the ways Clark determined Winters failed to perform his duties and implement Clark's vision of reform. *Id*. It is undisputed that Williams did not participate in the decision to place Winters on administrative leave and had no decision-making power to terminate Winters. *Id*. ¶¶ 35-36.

Despite requiring City Council's approval to terminate the Chief of Police, Clark waited until March 9, 2020, nearly two months after terminating Winters, to present Winter's termination to City Council. *Id*. The majority of aldermen voted to disapprove Winters' termination. *Id*. Clark also hired Winters' replacement as Chief of Police, Robert Collins, the same day he placed Winters on administrative leave, *before* Winters was officially removed and before presenting Winters' termination to City Council. *Id*.

Defendants maintain that Clark terminated Winters because he failed to implement Clark's vision of reform to his satisfaction. *Id*. ¶ 26. Winters disputes this, and claims he worked to implement reform. [87] ¶ 26. Winters testified he created a comprehensive strategic plan for the HPD with guiding principles of professionalism,

10

integrity, dedication, respect, leadership and strategic goals of ensuring organizational strength, enhancing crime prevention strategies, engaging in effective policing, developing, strengthening, and sustaining partnerships with other law enforcement agencies and with the community through community policing, enhancing personnel development, enhancing infrastructure and equipment, and rebranding HPD's image. *Id*. During his tenure, he created a detailed needs assessment, a general email address for complaints, and he sent officers to previously unafforded training. *Id*. Winters also hired a community organizer to show his commitment to community policing. *Id*. Winters further remained in contact with outside law enforcement agencies and implemented new initiatives to clean up corruption and ensure the HPD operated lawfully and ethically. *Id*.

Despite these achievements, Clark gave City Council a document that contained a purported list of performance complaints about Winters, including a list of ways Winters failed to perform the duties of Chief and failed to implement Clark's vision of reform. [80] ¶ 27. Winters denies that the list contained the real reasons for his termination. [87] ¶ 27. Winters maintains that he was terminated because he rescinded the promotions of Giddens and Winston, Clark's political supporters. *Id*. It is undisputed that after Winters was terminated, Armstrong was moved to patrol. [80] ¶ 62.

Winters brings his complaint under 42 U.S.C. § 1983 alleging in Count I that all Defendants retaliated against him in violation of the First Amendment based on speech and in Count II that the City and Clark retaliated against him based on

11

Political Affiliation. Winters also brings state law claims including alleging in Counts IV and V that the City of Harvey retaliated against him in violation of the Illinois Whistleblower Act and in Count VI that all defendants discharged him in retaliation in violation of the Whistleblower Act. [1]. Defendants move for summary judgment on all Counts. [79].

## ANALYSIS

Defendants move for summary judgment on the First Amendment federal claims arguing that they fail as a matter of law: (1) because Winters falls into the policy maker exception that allows for his removal for political reasons;[3] and (2) Winters' speech is not protected under *Garcetti* v. *Ceballos*, 547 U.S. 410 (2006). Next, Defendants argue (3) Count II and Counts IV and V (Illinois whistleblower claims) fail because (i) the commander positions on the Mayor's security detail are confidential positions, and (ii) Winters has not presented evidence that Clark knew Armstrong was speaking with the FBI or that Clark directed Winters to fire Armstrong. Defendants also argue (4) Count II fails because Clark is entitled to Qualified Immunity.[4]

Williams argues he should be dismissed from the two Counts that name him, Counts I and VI, because he did not personally participate in any of Winters' claimed constitutional or state law violations. Finally, Defendants assert the Court should

---

[3] Defendants assert that same argument applies to the Illinois Whistleblower claims. [81] at 3-6.

[4] Plaintiff voluntarily dismissed Counts III and VII. *See* [34].

decline to exercise supplemental jurisdiction over the state law claims. The Court analyzes the claims in turn below.

  I.   **Winters falls into the *Elrod-Branti* policymaker exception.**

As an initial matter, the Court is not asked to opine about whether smart or ethical decisions were made here or whether it was a good decision as a matter of policy to promote Giddens, Winston and Biddings and to reassign Officer Armstrong. Along those same lines, the Court acknowledges that there are any number of material facts in dispute regarding the decisions to promote these individuals and to reassign Officer Armstrong. However, relying on the *Elrod-Branti* policymaker exception, Defendants argue that Winters' First Amendment claims fail as a matter of law. The exception allows for policy makers to be terminated for political reasons even if such termination would constitute retaliation for First Amendment purposes. [81] at 3-6. Winters responds that the *Elrod-Branti* exception does not apply because he was not fired for political reasons, but rather for allegedly failing to implement Clark's vision of reform to Clark's satisfaction. [86] at 3-4. The Court agrees with Defendants.

It is well-established that policymakers or decision makers may be terminated for political reasons even if such termination would normally constitute retaliation under the First Amendment. *See, e.g., Branti v. Finkel*, 445 U.S. 507, 517-18 (1980); *Elrod v. Burns*, 427 U.S. 347, 360-73 (1976); *Grossart v. Dinaso*, 758 F.2d 1221, 1226 (7th Cir. 1985) (citations omitted). The policymaker exception applies to employees who "act as an adviser or [who] formulate[] plans for the implementations of broad

13

goals". *Elrod*, 427 U.S. at 368. In determining whether an employee is a policy maker, *Elrod* and *Branti* require a district court to examine "the *powers* inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Upton v. Thompson*, 930 F.2d 1209, 1214 (7th Cir. 1991) (internal citations and quotations omitted).[5] "The test is whether the position held by the individual authorizes, either directly or indirectly, *meaningful input* into government decisionmaking on issues where there is room for principled disagreement on goals *or their implementation.*" *Id*. *See also Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir. 1985) ("[A]n employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and his superiors, and second, he has meaningful direct or indirect input into the decisionmaking process.").

Here, Winters as the Chief of Police, had the responsibility of general management and control of the police department, including administering the HPD consistent with the law. According to the Municipal Code, Police Chief Winters: developed training programs for his officers, controlled hiring and firing, managed resources in the department to strengthen public perception (i.e. the community policing division), was a point of contact for other law enforcement agencies, and had discretion to set the policy agenda, including enhancing the safety efforts of the

---

[5] It is undisputed that Winters had the power to hire and fire police personnel. This case presents disputed facts as to whether Clark usurped that power for patronage reasons. But the court's analysis is limited to whether the powers to hire and fire were inherent to the office of Chief of Police. Assuming Clark usurped those powers, not in the interest of good policing but to repay political work, is a matter for the voters, not this Court.

department. He was undoubtedly a policy maker. *See also Rodez v. Vill. of Maywood*, 641 F. Supp. 331, 338 (N.D. Ill. 1986) (finding that the Maywood Police Chief was a policymaker).

Winters was tasked with working closely with Mayor Clark and City Administrator Williams to formulate HPD's direction and guiding principles. Consequently, Winters had "both direct and indirect input of a meaningful nature into government decision making where there is room for principled disagreement." The policy-maker exception under *Elrod-Branti* excludes him from First Amendment's retaliation protections. *See Rodez*, 641 F. Supp. 331, 336-36 (finding the First Amendment did not protect the plaintiff from retaliation where there was a disagreement between the plaintiff police chief and the Village Officials as to how the department should be operated). Given Winters' valid concerns about Giddens and Winston's appointment to the Commander positions, and Clark's testimony that he wanted to appoint them for security reasons and because he believed they supported his vision for reform, there is sufficient room for principled disagreements regarding how to operate the police department. Because of that legitimate disagreement, the policymaker exception provides that the First Amendment's protections don't "interfere with . . . the ability of duly elected officials to implement their policies." *Id.* at 337-338. *See also Elrod*, 427 U.S. at 368 (reasoning the exception is necessary

15

because "representative government should not be undercut by tactics obstructing the implementation of policies of the new administration").

Winters responds that he was not fired for political reasons, but because he was not, according to Clark, carrying out Clark's promised agenda. It is true Winters was not terminated because of his political affiliation, but that puts too fine a point on the doctrine. The Court finds that the policy maker exception applies because Clark terminated Winters when Clark determined Winters was not able or willing to carry out Clark's promised agenda (despite Winters' good faith concerns that Clark was dedicated to reform). This is a difference of political agenda (even though Clark's "good government" political agenda might be shallow) that makes the policymaker exception necessary. *See Bonds v. Milwaukee County*, 207 F.3d 969, 977 (7th Cir. 2000) (policy making jobs require a heightened sense of confidence that policymaking individuals share the same "political compass" and "shared agenda" as the representative government).

Accordingly, the Court grants summary judgment as to Count I and Count II.

## II. Winters' speech is not protected under *Garcetti.*

In the alternative, Defendants argue that Winters' speech is not protected under the First Amendment because his speech would not have occurred but for his employment with the City under *Garcetti,* 547 U.S. at 410. [81] at 6-9. Winters responds that Defendants have not met their burden to provide evidence that reporting unlawfulness to outside agencies, for instance to the FBI, or to human

16

resources was a part of Winters' ordinary and daily professional job duties. [86] at 5-11.

The Supreme Court held in *Garcetti* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.". 547 U.S. at 421. The Court did not define the scope of an employee's duties where there is room for debate, but explicitly denied "that employers can restrict employee's rights by creating excessively broad job descriptions." *Id*. at 424. The key question for courts is whether the employee makes the relevant speech pursuant to their *official duties. Lett v. City of Chicago*, 946 F.3d 398, 400 (7th Cir. 2020). In answering the question, courts have taken a practical view and consider the employee's level of responsibility. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008). "An employee with significant and comprehensive responsibility for policy formation and implementation . . . has greater responsibility to speak to a wider audience on behalf of the governmental unit." *Id*. Reporting alleged misconduct against an agency which one has supervisory responsibility is part of the individual's duties. *Id.* (citing *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007).

The Supreme Court has also held that general workplace grievances are not entitled to constitutional protection under the First Amendment. *See Connick v. Meyers*, 461 U.S. 138, 147 (1983) ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of

17

personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum . . .").

It is undisputed that public corruption is a matter of public concern. The dispute surrounding the FBI disclosure centers on whether Winters' reports to the FBI were within his official duties. Here, Winters had significant responsibility for the HPD and oversaw the implementation of policies and procedures. Under circuit caselaw, he had a duty to report alleged misconduct that he discovered in the HPD. *Sigsworth*, 487 F.3d at 511. Because of that duty, his voluntary report to the FBI about the possible evidence of crime stored in the garage were not protected under *Garcetti*. *See also Morales v. Jones*, 494 F.3d 590, 596-7 (police officer's reporting of his superiors' misconduct was not protected because his speech was made pursuant to his official duties). The report Winters made to human resources is not protected under *Garcetti* and *Connick* because the threat was not a matter of public concern,[6] but likely rather a workplace grievance. Winters was reporting on an interpersonal conflict with Williams, unrelated to concerns for the general community. *See Cygan v. Wi. Dep't. of Corr*. 388 F.3d 1092, 1099 (7th Cir. 2004) (the Court "must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social or other concern to the community."). *Compare Lane v.*

---

[6] At this stage, the Court resolves all disputes and inferences in favor of Plaintiff and accepts the contents of the report as true despite Williams' denial. *Viamedia, Inc.*, 951 F.3d at 467.

18

*Franks*, 573 U.S. 228 (2014) (misuse of state funds and public corruption is a matter of public concern).

The cases Winters cite are distinguishable.[7] In *Kristofek v. Village of Orland Hills*, the Seventh Circuit found that the plaintiff's statements to other officers and the FBI about misconduct in the department was not made pursuant to his official duties. 832 F.3d 785, 793 (7th Cir. 2013). Indeed, in finding that the plaintiff's speech was protected, the *Kristofek* court considered that the plaintiff's responsibilities "as a part-time police officer involved traffic enforcement and placing calls for public service and officer back-up." *Id*. Here, contrasted with the *Kristofek* plaintiff, Winters was responsible for the entire police department of Harvey and was responsible for interfacing with other law enforcement agencies. *Spaulding v. City of Chicago*, 186 F. Supp. 3d 884, 904 (N.D. Ill. 2016) fails to persuade for similar reasons. There, unlike here, the plaintiff officers reported disgraced former CPD Sargeant Ronald Watts to the FBI while working for the department "off-duty and on their own time". *Id*. Significantly, at the time of the reports, both officers were assigned to the Narcotics division, and had no supervisory responsibilities. *Id*. at 898. As explained *supra*, Winters had responsibility for the department.

Accordingly, the Court finds that neither Winters' speech to the FBI or to the human resource department was protected under the First Amendment. The Court

---

[7] In *Lane*, the Supreme Court held that truthful testimony made *under oath* by a public employee outside the scope of his ordinary job duties is protected speech under the First Amendment. 573 U.S. at 238. Here, Winters did not report his concerns about the items stored in the garage to the FBI or the Williams threat to human resources under oath. The *Lane* exception is thus inapplicable.

declines to reach all other arguments, and grants summary judgment solely based on the First Amendment claims. The Court declines to exercise supplemental jurisdiction. Plaintiff's state law claims are dismissed without prejudice.

## CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment [79] as to Counts I and II (First Amendment Retaliation). The Court dismisses Plaintiff's state claims (Counts IV-VI) without prejudice. Civil case terminated.

E N T E R:

Dated: August 21, 2024

MARY M. ROWLAND
United States District Judge